UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MEGAN MICHELLE KERNS,                    )
                                         )
        Plaintiff,                       )
                                         )
    v.                                   )        No.   4:15 CV 1483CAS
                                         )                        (JMB)
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
        Defendant.                       )

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration.   The

suit involves an Application for Supplemental Security Income.  Plaintiff has filed a Brief in

Support of her Complaint, and the Commissioner has filed a Brief in Support of her Answer.  The

case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C.

§ 636(b).

I.    Procedural History

    On June 16, 2011, Plaintiff Megan Michelle Kerns ("Plaintiff") filed an Application for

Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et

seq. (Tr. 196-201)[1]  Plaintiff claimed that her disability began on April 19, 2007, as a result of

injuries she sustained in a serious car accident.  On initial consideration, the Social Security

Administration denied Plaintiff's claims for benefits.  Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ"), which was held on March 14, 2014.  (Tr. 28-61)  Plaintiff

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 12/filed November 19, 2014).

testified and was represented by counsel. (Id.) Vocational Expert Denise Weaver also testified at the hearing. (Tr. 57-60, 74-75, 163-64) Thereafter, on April 7, 2014, the ALJ issued a decision denying Plaintiff's claims for benefits. (Tr. 8-19) In support of her administrative appeal, Plaintiff submitted a brief and a document from Victoria Dow, M.D., described as a "Request for Medical Advice," dated February 14, 2012. (Tr. 5, 296-302, 661-64) The Appeals Council considered these documents but found no basis for changing the ALJ's decision and denied Plaintiff's request for review on July 23, 2015. The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.     Hearing on March 14, 2014[2]

#### 1.     Plaintiff's Testimony

At the hearing on March 14, 2014, Plaintiff testified in response to questions posed by the ALJ and counsel. (Tr. 31-67) Plaintiff testified that she is single and lives with her mother and her two-year old son. (Tr. 48, 50) Plaintiff testified that she did not complete high school because she was depressed and using a walker after her accident. (Tr. 31, 35) Plaintiff has one child, a son, who was almost two years old at the time of the hearing before the ALJ. (Tr. 50)

At the outset of the hearing, Plaintiff stated that she could not walk very long and that even sitting bothered her. The ALJ offered to have Plaintiff get up and move around during the hearing so long as she stayed close to the microphone. (Tr. 36)

Plaintiff testified that after a car accident on April 19, 2007, she was hospitalized and had a series of six surgeries including jaw reconstruction surgery, facial reconstruction surgery, lumbar

---

[2]The hearing started at 9:05 a.m. and concluded at 10:03 a.m. (Tr. 27, 74)

surgery with two rods and eight screws inserted in her back, and spinal fusion surgery from T11-L3. (Tr. 32, 34) Plaintiff also sustained burn injuries on her left shoulder and buttocks requiring skin grafts. (Tr. 33) After completing inpatient rehabilitation, Plaintiff received outpatient rehabilitation. (Id.)

Plaintiff testified to significant residual physical difficulties including bilateral foot drop and spasms in her legs. (Tr. 35) In 2011, Plaintiff had right foot surgery, a tendon transfusion. (Tr. 38) Plaintiff wears leg braces to straighten her foot and to enable her to wear shoes. (Tr. 39) Plaintiff testified that her bilateral foot drop and leg conditions have not improved. (Tr. 42-43) To alleviate her pain, Plaintiff reportedly reclines in a horizontal position for twenty minutes. (Tr. 45)

As result of her injuries, Plaintiff testified that she can only sit or stand for five minutes at a time before her legs turn purple and start tingling. (Tr. 35, 38, 59) When sitting, Plaintiff noted that she has to elevate her legs to waist level and switch positions. (Tr. 35, 38, 52) Plaintiff testified that she also has balance problems caused by her spinal cord injury. Plaintiff testified that she can remain in a seated position for four hours and stand in a stationary position for two hours in an eight-hour workday. (Tr. 46) Plaintiff testified that she cannot bend over or squat. (Tr. 35, 38, 52) Plaintiff's foot drop prevent her from driving a car because she cannot push the foot pedals. (Tr. 37) Plaintiff testified that she walks slowly and she needs to use a hand rail to go up stairs. Plaintiff can walk a block in five minutes but then she would need to rest. (Tr. 47) Plaintiff cannot shop for more than thirty minutes to an hour, and she must use a cart for balance. (Tr. 55-56) Cold or hot weather exacerbates Plaintiff's conditions. (Tr. 57)

Plaintiff lives with her mother at her mother's house. (Tr. 48) Plaintiff testified that she would not be able to live alone because she needs help taking care of her son. (Tr. 49) Typically Plaintiff spends the day at home, and she helps around the house by doing the laundry and the dishes. (Id.) While watching her son, Plaintiff is able to sit down and take breaks. (Tr. 54)

Plaintiff testified that she is unable to work because of the injuries she sustained in the car accident. (Tr. 50)

The ALJ questioned Plaintiff about the function report wherein she reported that she watched her three-year old nephew while her sister worked during the day. (Id.) Plaintiff explained that she would keep the children in one room with closed doors. (Tr. 51) Plaintiff testified that she can occasionally lift her twenty-five pound son but she would need to hold onto something to maintain her balance. The ALJ noted a possible discrepancy in that Plaintiff reported she shopped with her sister for food and household items once a week for thirty minutes to an hour, but she testified that she could only walk a block in five minutes. (Tr. 56) Plaintiff explained that she would push the shopping cart to help her with balance, and she could shop for thirty minutes. (Id.) Plaintiff testified that if she shopped at a mall, she would use a motorized cart because shopping at the mall requires more walking. (Tr. 58)

The ALJ noted that, although Plaintiff dropped out of high school in the twelfth grade, she completed nearly two years of schooling after her car accident. (Tr. 60)

Plaintiff testified that her mother encouraged her to file for disability. (Tr. 62) Plaintiff indicated that she has never looked for work or gone through vocational rehabilitation. (Id.) Plaintiff explained that she does not have a primary care physician because there is nothing doctors can do to improve her permanent conditions. (Tr. 64-65) Plaintiff testified that her

physical therapist indicated that her conditions would become worse as she aged.  (Tr. 60)

## 2.    Testimony of Vocational Expert

Vocational Expert Ms. Denise Weaver ("VE"), a rehabilitation counselor, testified at the hearing.  (Tr. 67-74, 163-64)

The ALJ asked the VE to consider several hypothetical questions based on Plaintiff's condition.  The ALJ first asked the VE to assume a hypothetical individual similar to Plaintiff in age, education, and no past work experience who could perform work at the sedentary level with occasional lifting up to ten pounds; frequent lifting and carrying of less than ten pounds; standing and walking two hours; and sitting six hours.  There would be a sit/stand option allowing the individual to change her position at least every thirty minutes for a few minutes while remaining at the work station.  Further, the individual could not operate foot controls and could not perform work requiring climbing on ropes, ladders, or scaffolds, with no more than occasional climbing on ramps and stairs, stooping, kneeling, crouching, or crawling.  The individual would have to avoid all exposure to temperature extremes and concentrated exposure to work hazards such as unprotected heights and dangerous moving machinery.  (Id.)  The ALJ further noted that the individual would need some kind of device or a wall to hold onto when walking more than five minutes.  (Tr. 69)

The VE indicated that such an individual could perform jobs including working as a document preparer, a dowel inspector in the woodworking environment, and a patcher in the household appliance industry.  The VE noted that the sit/stand option is not set forth in the DOT, but she used her professional experience to determine the tasks required in the three positions she cited would allow for such option.  (Id.)  The VE further explained that because the positions are

primarily clerical positions, the individual would be able to use a cane or a wall for balancing. (Tr. 70)

Next the ALJ changed the limitations in the hypothetical as follows: "walking was reduced to no more than one hour out of an eight-hour workday, five minutes at a time, and standing two and a half hours out of an eight-hour workday, 20 minutes at a time. But less than occasional stooping or bending, which I would further define as not more than ... 5 percent of the workday." (Id.) The VE indicated that such individual could still perform the jobs she cited in response to the first hypothetical.

When asked about the hypothetical individual's need to elevate her legs at least waist high when sitting, the VE noted that this would have to be an accommodation given by the employer, and questioned whether an employer would permit such an accommodation for a probationary employee. (Id.)

Plaintiff's counsel also posed a question to the VE. Plaintiff's counsel changed the limitations in the hypothetical so that the individual was only able to sit for ten minutes and then had to leave the work station to move around for five to ten minutes before returning to the work station. (Tr. 72) The VE indicated that a probationary employee would not be able to retain employment. (Tr. 73)

### B.     Forms Completed by Plaintiff

In a Disability Report - Adult form completed on June 16, 2011, Plaintiff reported that she has never worked. (Tr. 213-19) In a Function Report - Adult form completed on July 27, 2011, Plaintiff reported her injuries limit her ability to work because she has balance issues and a dropped foot, and she cannot walk, sit, or stand for a long period of time. (Tr. 234) Plaintiff

listed taking care of her three-year old nephew during the work day, cleaning the house, preparing easy meals, and watching television as her daily activities. (Tr. 235) Plaintiff reported that she can complete household chores including doing the dishes, laundry, and other chores. (Tr. 236) Plaintiff uses a brace/splint prescribed by a doctor in 2007, to assist in getting her foot in a shoe. (Tr. 240)[3]

In a Disability Report - Appeal form, Plaintiff did not allege any worsening or new impairments since she filed her last disability report on June 16, 2011. (Tr. 248) Plaintiff explained that she struggles with walking "since I have drop foot on both my feet. I have to wear braces that go to my knees to help me walk better and to get my shoes on.... I can not walk long distances or up and down any inclines." (Tr. 250) Plaintiff further indicated that she has to keep her feet elevated because of her poor blood flow, and she cannot sit for extended periods of time.

### C.    Medical Records and Other Records

#### 1.    General History

The medical evidence in the record shows that Plaintiff has a history of spinal cord injury with residual bilateral foot drop and left humerus fracture. (Tr. 311-660) Although the undersigned has carefully considered all of the evidence in the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, only the medical records relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are discussed.

#### 2.    St. Louis Children's Hospital (Tr. 487-527)

Between April 20, 2007, and May 15, 2007, Plaintiff was hospitalized at St. Louis

---

[3]The undersigned notes that both the Disability Report-Adult form and the Function Report-Adult form were completed before the birth of Plaintiff's son.

Children's Hospital after being seriously injured in a car accident. Plaintiff was an unrestrained front seat passenger in a roll-over accident. She was ejected from the vehicle and then trapped underneath for ten minutes.

A CT scan showed Plaintiff had a pulmonary contusion, right pneumothorax, small left pneumothorax, right distal oblique humerus fracture with significant displacement angulation, fractures of the right superior-inferior ramus, widening of the pubic symphysis, nondisplaced sacroiliac fracture, a large scalp evulsion, left orbital fracture, L1 vertebral fracture with evulsion and compression into the canal. A CT scan of Plaintiff's head showed no acute intracranial process; a large scalp laceration; depressed left zygomatic arch fracture with osseous fragments in her left orbit; a left mid face fracture; a fracture of the lateral wall of the right maxillary sinus; and a fracture of the right mandibular ramus. A CT scan of Plaintiff's chest showed bilateral pulmonary contusions; sternal fracture; traumatic pancreatic injury; multiple right rib fractures; right L2 transverse process fracture; and multiple pelvic fractures. A CT scan of Plaintiff's cervical spine showed straightening with no fracture or listthesis. An MRI of Plaintiff's spine revealed a burst fracture at L1 with 50% retropulsion into the spinal canal causing compression of the conus medullaris with cord signal abnormality. Plaintiff also suffered a large degloving scalp laceration, and her left buttock and left shoulder had full-thickness skin burns.

On April 24, 2007, Dr. Albert Woo performed an open reduction and internal fixation to repair Plaintiff's left complex fracture. The next day, Dr. Matthew Dobbs performed a intramedullary nail fixation of Plaintiff's left humeral shaft fracture.

On April 29, 2007, Dr. Jeffrey Leonard performed a thoracolumbar posterior spinal fusion, a L1 laminectomy, and an autograft.

On May 6, 2007, Dr. Gregory Borschel performed a debridement and split-thickness skin grafting to Plaintiff's left back and left buttocks.

Plaintiff's discharge diagnoses included motor vehicle collision poly trauma; paraplegia; L1 fracture; spinal cord compression; multiple facial, rib; sternal fractures; left humerus fracture; pelvic fracture; and left buttock and left shoulder full-thickness skin burns. Upon discharge, Plaintiff was transferred to Rankin Jordan Hospital for rehabilitation. On June 7 and August 9, 2007, Plaintiff returned to St. Louis Children's Hospital for follow-up surgical procedures, removal of arch bars and left humeral shaft hardware.

### 3. Ranken Jordan Hospital - Dr. Nicholas Holekamp (Tr. 326-484)

Between May 15, 2007, and June 12, 2007, Plaintiff received inpatient rehabilitation services at Ranken Jordan Hospital. Plaintiff received wound care, rehabilitation, and pain management services for injuries sustained in her car accident. At the time of discharge on June 12, 2007, Plaintiff was using a reclining wheelchair. The physical therapist noted that Plaintiff would continue to benefit from physical therapy at an outpatient clinic or hospital.

### 4. Woods Mill Orthopedics Ltd - Dr. Andrew Rouse (Tr. 304-12, 529-32)

Between May 19, 2010, and August 6, 2010, Dr. Andrew Rouse, of Woods Mill Orthopedics Ltd, treated Plaintiff's ankle dorsiflexion, persistent plantarflexion of her right foot, and toe drop.

On May 19, 2010, Dr. Rouse discussed surgery and follow-up therapy with Plaintiff to prevent her toes from drooping. On June 1, 2010, Dr. Rouse performed a right splint anterior tibial tendon transfer, a flexor hallucis longus release, and an extensor digitorum time extensor hallucis longus tenodesis. Plaintiff was discharged the next day. In follow-up treatment, Dr.

Rouse noted that Plaintiff had a nice balanced ankle with dorsiflexion, and prescribed physical therapy.  Dr. Rouse placed Plaintiff in a short-leg removable walker.  On August 6, 2010, Dr Rouse found that "[c]linically, [Plaintiff] has a very nice symmetrical dorsiflexion in the ankle." Dr. Rouse directed Plaintiff to let him know if any problems developed.  There is no indication in the record that Plaintiff ever returned to Dr. Rouse.

###     5.     **Advanced Physical Therapy - Sandy Miller** (Tr. 535-631)

Between December 11, 2007, and September 14, 2010, Sandy Miller, a physical therapist ("PT") at Advanced Physical Therapy, treated Plaintiff.

Plaintiff started treatment on December 11, 2007, after receiving a prescription from Dr. Solanski, her pediatrician, to address the persistent weakness in Plaintiff's lower legs.  In the Initial Evaluation, the PT noted that "[p]atient had rehabilitation over the summer, but did not complete recommended therapy secondary to not feeling any progress at the facility she was at." (Tr. 548)  Plaintiff's chief complaints were weakness and loss of function restricting her activities including walking, squatting, and stair climbing.  After examining Plaintiff, the PT opined that Plaintiff required twice a week "skilled rehabilitative therapy in conjunction with a home exercise program to address the problem and achieve goals."  (Tr. 549-50)  The PT identified ambulation, balance, weakness, muscle performance, and gait/locomotion to be Plaintiff's impairments.

During treatment on December 14, 2007, the PT noted that "[Dr. Solanski] wants to see compliance with PT or rehabilitation needs to stop.  Because of her previous non-compliance with [physical therapy] over summer and her overall attitude towards injury."  (Tr. 554)  The PT used aerobic conditioning, manual interventions, tubing, isometrics, and stabilization training as treatment.  Plaintiff returned for treatment on December 17, 19, 26, 27, and 31, 2007.  During

treatment on December 27 and 31, 2007, Plaintiff reported that she was ambulating better.

Plaintiff returned for treatment on January 4, 7, 14, 16, and 23, 2008. On January 4, 2008, Plaintiff reported that her orthopedist recommended that she wear different shoes and fixed her brace. On January 14 and 16, 2008, Plaintiff reported feeling much better and being more compliant with wearing her braces. On January 23, 2008, Plaintiff reported that people have commented that she was walking "so much better." (Tr. 588) On February 27, 2008, however, the PT discharged Plaintiff from treatment because of her non-compliance in returning for any further visits.

Plaintiff resumed physical therapy two years later in July, 2010. Dr. Rouse prescribed physical therapy after he performed surgery to repair her right ankle and foot. During her therapy, Plaintiff reported working as a babysitter on a part-time basis. The PT identified Plaintiff's impairments as weakness, range of motion, posture, joint integrity/mobility, functional activities, balance and ambulation. Plaintiff returned for treatment on July 21 and 29, 2010. The PT noted that prior to surgery, Plaintiff had very little active ankle dorsiflexion and her foot was introverted. The PT used flexibility exercises, tubing, and manual interventions as treatment. The treatment goal was to improve Plaintiff's range of motion of her foot/ankle. Plaintiff cancelled her scheduled appointments on July 27 and 30, 2010.

Plaintiff returned for treatment on August 3, 10, 12, 17, 19, and 24, 2010. During treatment on August 3, 2010, Plaintiff noted the surgery "really helped with my (R) foot." (Tr. 605) The PT listed improvement of Plaintiff's range of motion, mobility, and balance as the treatment goals. During treatment on August 17, 2010, Plaintiff reported improvement in her overall condition. On August 5, 26, and 31, and September 2, 2010, Plaintiff either cancelled or

failed to show up for the scheduled appointments.

In a September 14, 2010, Discharge Summary, the PT noted that Plaintiff did not complete physical therapy, and failed to return calls to reschedule appointments. The PT found that during treatment, Plaintiff met 75% of the goals of physical therapy, including improvement in her range of motion of her foot/ankle.

## 6. Washington University Orthopedics - Dr. Chi-Tsai Tang (Tr. 637-60)

On March 28, 2013, and November 11, 2013, Dr. Chi-Tsai Tang, an assistant professor of physical medicine and rehabilitation at Washington University Orthopedics, examined Plaintiff for disability purposes.

On March 28, 2013, Plaintiff presented "inquiring about applying for disability." (Tr. 638) Plaintiff reported choosing the office on referral by Children's Hospital and noted needing to see a doctor "to evaluate me for disability." (Tr. 652) Plaintiff reported having bilateral foot drop, chronic back pain with prolonged sitting of more than five minutes, occasional numbness, leg spasms, and pain. Manual muscle testing of Plaintiff's lower extremities "revealed 0/5 strength with bilateral EHL testing, 3+/5 strength with right ankle dorsiflexion, 0/5 strength with left ankle doriflexion." (Tr. 638-39) Dr. Tang referred Plaintiff for a functional capacity evaluation.

On referral by Dr. Tang, Dean Schlmanski, an occupational therapist registered at ProRehab, completed a Functional Capacity Evaluation on April 8, 2013. Mr. Schlmanski found that Plaintiff "has demonstrated some functional ability in at least the Light physical demand level," including sitting as much as 66% of an eight-hour workday and occasional bending and squatting while wearing her foot braces. (Tr. 641, 643) Mr. Schlmanski further found that "plaintiff would benefit from the opportunity to take occasional transitional posture breaks with

prolonged standing or sitting tasks to help manage her symptoms." (Tr. 641) Mr. Schlmanski

found that Plaintiff ambulates with an abnormal gait that was more pronounced on ramps, and she

"braces on a stable support during transitions to/from squat or kneeling." (Id.) Mr. Schlmanski

did not impose a time limitation for sitting at one time or indicate that Plaintiff had to elevate her

legs while sitting. Examination showed Plaintiff's ankle strength to be 4/5 for plantarflexion, 3/5

for doraiflexion strength, and 2+/5 for eversion. Mr. Schlmanski found that the Berg Balance

Test suggested that Plaintiff "is at a low fall risk while wearing her AFOs."[4] (Tr. 641, 645)

Plaintiff reported being independent with her activities of daily living, including light chores

around the house and caring for her ten-month old son. Plaintiff reported the following functional

activities to be impacted: prolonged walking, climbing steps, prolonged sitting, heavy lifting,

carrying her son around the house, and balance issues due to bilateral foot drop. Mr. Schlmanski

observed Plaintiff place her son into a child seat in the back seat of a vehicle before leaving. (Tr.

651)

      In a follow-up office visit on November 11, 2013, Dr. Tang's notes indicate Plaintiff

presented for a disability evaluation and paperwork after having a functional capacity evaluation.

Dr. Tang noted Plaintiff has bilateral foot drop, status post surgery on the right foot with slight

improvement. In the treatment plan, Dr. Tang identified the follow-up to be "call[ing] the

lawyer's office in regards to whether I need to give her a disability rating." (Tr. 636) Dr. Tang

noted that he had completed Plaintiff's paperwork for her attorney for disability and returned the

paperwork to Plaintiff.

      Dr. Tang also completed a one page "Functional Capacity Statement" ("FCS"), dated

---

[4]An ankle foot orthosis is a brace that provides support for drop foot.
www.nationalmsociety.org/Glossary

November 11, 2013.  In that FCS, Dr. Tang found Plaintiff to be:  (1) able to stand 2.5 hours, 20 minutes at a time in an 8-hour workday; (2) walk 1.5 hours, 5 minutes at a time in an 8-hour workday; (3) sit 4 hours with her legs elevated most of the time; and (4) never bend or stoop. With respect to Plaintiff's ability to lift/carry and push/pull, Dr. Tang found Plaintiff to be able to lift 20 pounds and carry 30 pounds and push 39 pounds and pull 32 pounds.  Dr. Tang noted that Plaintiff is unable to operate foot controls due to foot/ankle numbness.  Dr. Tang opined that prolonged standing, walking, or sitting causes Plaintiff to experience pain and increases spasms in her right foot.  In support of these limitations, Dr. Tang cited the functional capacity evaluation completed by Mr. Schlmanski.

### 7.      Other Record Evidence

#### a.      *Consultative Examination Report -Dr. Vittal Chapa* (Tr. 314-17)

At the request of Disability Determinations, a state agency, Dr. Vittal Chapa completed an evaluation of Plaintiff on October 8, 2011, after evaluating Dr. Rouse's records and examining Plaintiff.  Plaintiff reported that she wears bilateral leg braces and her balance is impaired. Plaintiff indicated that she cannot walk very far, and she needs leg braces to walk.  Dr. Chapa's examination showed Plaintiff had a limited range of motion of her ankle joints, with her left ankle inverted and weakness in her ankles.  Dr. Chapa found Plaintiff had bilateral footdrop, and her balance to be impaired.  Dr. Chapa reported that Plaintiff's upper extremity and handgrip strength to be 5/5.  Dr. Chapa observed Plaintiff to be unstable on her feet due to bilateral foot drop and walking slowly taking short strides.

**b.** ***Physical Residual Functional Capacity Assessment -Dr. Julio Pardo*** (Tr. 318-25)

Dr. Julio Pardo, a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment on November 4, 2011. Based on a review of the medical records, Dr. Pardo determined that Plaintiff can occasionally lift or carry ten pounds and frequently lift less than ten pounds. Dr. Pardo also determined that Plaintiff can stand or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had no limitations in pushing and pulling. Dr. Pardo noted Plaintiff has a postural limitation precluding climbing ladders, ropes, and scaffolds due to issues with balance and bilateral foot drop. Dr. Pardo also found an environmental limitation necessitating Plaintiff to avoid hazardous machinery and heights due to balance issues.

**c.** ***Illinois Request for Medical Advice -Dr. Victoria Dow*** (Tr. 661-64)

In the February 14, 2012, Illinois Request for Medical Advice, Dr. Victoria Dow affirmed the initial determination by Dr. Chapa as written because there was no allegation of a worsening of any previously documented impairment.

## III.   The ALJ's Decision

On April 7, 2014, the ALJ issued an adverse decision denying Plaintiff's request for SSI benefits. The ALJ noted that Plaintiff has not engaged in substantial gainful activity since June 16, 2011, the application date. (Tr. 13) The ALJ found Plaintiff has the severe impairments of a history of spinal cord injury with residual bilateral foot drop, and a history of a left humerus fracture, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P. (Tr. 13)

The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform sedentary work with additional limitations. Plaintiff can walk for one hour out of an eight-hour workday, for five minutes at a time, and stand for two and a half hours out of an eight-hour workday, for twenty minutes at a time. Plaintiff is limited to less than occasional stooping or bending. Plaintiff will require a "sit/stand option" allowing a change in position every thirty minutes for a few minutes at a time while remaining at the work station. Plaintiff can perform work that does not require climbing on ropes, ladders, or scaffolds, and no more than occasional climbing of ramps and stairs, kneeling, crouching, or crawling. Plaintiff cannot operate foot controls and should avoid all exposure to temperature extremes and work hazards such as unprotected heights and being around dangerous machinery. (Tr. 14)

Plaintiff has no past relevant work. (Tr. 18) Plaintiff has a limited education and is able to communicate in English. The ALJ found that, considering Plaintiff's age, education, and residual functional capacity, there are jobs existing in significant numbers in the national economy she could perform, including a document preparer, dowel inspector, and a patcher. (Tr. 19) The ALJ concluded Plaintiff has not been disabled within the meaning of the Social Security Act since June 16, 2011, the date the application was filled. (Id.)

The ALJ also made specific findings as to Plaintiff's credibility and the weight to be afforded to the medical opinion evidence in the record. These findings are discussed in detail in the analysis below.

## IV.  Discussion & Overview of Analytical Framework

To be eligible for Supplemental Security Income ("SSI"), Plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of

Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  Additionally, a claimant will be found to have a disability "only if [her] physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, she is not eligible for disability benefits.  If the claimant has a severe impairment, the ALJ proceeds to step three and determines whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed, or is equal to a listed impairment, the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed, or is not the equivalent of a listed impairment, the ALJ proceeds to step four which asks whether the claimant is capable of doing

past relevant work.  If the claimant can still perform past work, he is not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ proceeds to step five to determine whether the claimant is capable of performing other work in the national economy.  In step five, the ALJ must consider the claimant's "age, education, and past work experience."  Only if a claimant is found incapable of performing other work in the national economy will he be found disabled.  20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.    The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the claimant's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

In her brief before this Court, Plaintiff raises three, interrelated issues. Plaintiff contends that the ALJ committed reversible error when: (1) the ALJ discounted Plaintiff's credibility; (2) the ALJ failed to give sufficient weight to the opinions of Dr. Tang by rejecting additional limitations; and (3) the ALJ formulated the RFC without including additional limitations for sitting, standing, and walking supported by the record.

### A.    Credibility Determination

The ALJ discounted Plaintiff's subjective complaints because she found Plaintiff to be only partially credible. Plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole.

The Eighth Circuit has instructed that, in the course of making an RFC determination, the ALJ is to consider the credibility of a claimant's subjective complaints in light of the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). See also 20 C.F.R. §§ 404.1529, 416.929. Accordingly, the undersigned will begin with a review of the ALJ's credibility determination. See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (it is clearly established that, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility).

The factors identified in <u>Polaski</u> include: a claimant's daily activities; the location, duration, frequency, and intensity of his symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of his medication; treatment and measures other than medication he has received; and any other factors concerning his impairment-related limitations. <u>See Polaski</u>, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529, 416.929. An ALJ is not, however, required to discuss each <u>Polaski</u> factor and how it relates to a claimant's credibility. <u>See Partee v. Astrue</u>, 638 F.3d 869, 865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each <u>Polaski</u> consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted); <u>Samons v. Astrue</u>, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every <u>Polaski</u> factor relates to the [plaintiff's] credibility"). Finally, this Court reviews the ALJ's credibility determination with deference and may not substitute its own judgment for that of the ALJ. <u>See Gregg v. Barnhart</u>, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination"); <u>Pearsall</u>, 274 F. 3d at 1218.

In this case, the ALJ concluded that Plaintiff's "statements with respect to the intensity, persistence, and limiting effects of her impairments are only partially credible. The credibility of those statements is undermined by a number of factors." (Tr. 17) In evaluating Plaintiff's credibility, the ALJ determined that she was not fully credible, in part, because the objective medical record, the variance between the medical opinions, her own activities of daily living, and the observation made by Occupational Therapist Schlmanski do not support her testimony

regarding her symptoms. <u>See Samons</u>, 497 F.3d at 820. The ALJ gave sufficient reasons for her adverse credibility finding and substantial evidence in the record supports the ALJ's reasoning. Although the ALJ did not specifically mention <u>Polaski</u>, her opinion complies with that analytical rubric, and she expressly considered numerous <u>Polaski</u> factors.

The ALJ noted that although Plaintiff sustained significant injuries in the 2007 motor vehicle accident, the subsequent medical records showed that she had regained a good deal of functionality. For example, the ALJ noted that although Plaintiff alleged ongoing and significant back pain limiting her activities, the medical record did not show Plaintiff sought pain management treatment or was prescribed pain medications. An ALJ is entitled to rely on a failure to seek regular medical treatment in discounting a plaintiff's credibility. <u>See Casey v. Astrue</u>, 503 F.3d 687, 693 (8th Cir. 2007). The ALJ properly found that this evidence detracted from Plaintiff's credibility regarding the severity of her symptoms.

In assessing Plaintiff's credibility, the ALJ also considered that the medical record showed improvement with treatment. For example, during follow-up treatment with Dr. Rouse and during physical therapy after Plaintiff underwent a tendon transfer procedure, she reported the surgery had helped her right foot.

In addition, the ALJ noted Plaintiff's history of noncompliance with physical therapy treatment. Plaintiff was discharged for noncompliance after missing several appointments. Failure to follow a prescribed course of treatment may detract from a plaintiff's credibility. <u>See Choate v. Barnhart</u>, 457 F.3d 865, 872 (8th Cir. 2006) (unjustified failure to follow prescribed treatment is grounds for denying disability).

Regarding Plaintiff's claim that she needed to elevate her feet, only Dr. Tang included

such a requirement. Dr. Tang noted that requirement in an FCS, in which he relied on the functional capacity evaluation of Occupational Therapist Schlmanski. But Mr. Schlmanski never included an elevation requirement in his evaluation. To the contrary, based on his examination and evaluation of Plaintiff, Mr. Schlmanski found that Plaintiff could perform light work, including sitting as much as 66% of an eight-hour workday, and occasionally squatting. Mr. Schlmanski did not limit the amount of time Plaintiff could sit in a given time frame, nor did he indicate that Plaintiff must elevate her legs while sitting. In fact, an ability to perform light work is generally inconsistent with Dr. Tang's much more restrictive limitations. Likewise, neither Dr. Chapa nor Dr. Pardo found the need for Plaintiff to elevate her legs while sitting, and the medical record shows Plaintiff did not report the need to elevate her legs during medical treatment. See Frederickson v. Barnhart, 359 F.3d 972, 977 n.2 (8th Cir. 2004) (holding that the fact that the plaintiff had not complained of severe pain to his treating physicians of symptoms undermined the credibility of his reports of those symptoms). Further, the undersigned notes that although the ALJ twice offered to have Plaintiff get up and move around during the almost one-hour hearing, it appears she did not do so, showing that Plaintiff was able to sit for almost an hour without getting up and moving around every five minutes.

The ALJ also considered that Plaintiff's actual activity level further undermined her assertion of total disability. Indeed, Plaintiff admitted in her June 16, 2011, disability report that, among other things, her activities included taking care of her three-year old nephew during the work day, cleaning the house, preparing easy meals, and doing household chores including doing the dishes, laundry, and other chores. See Julin v. Colvin, 2016 WL 3457265,*3 (8th Cir. June 24, 2016) (finding inconsistencies between plaintiff's subjective complaints of disabling

impairments and evidence of her daily living pattern including preparing meals, reading, going

shopping and cleaning houses several times a week, raised doubts as to her credibility).  In her

Disability Report - Appeal, Plaintiff did not allege any worsening or new impairments since she

filed her last completed disability report.  Furthermore, Occupational Therapist Schlmanski

reported that he observed Plaintiff place her son into a car seat, in the back seat of a vehicle

before leaving.

There are circumstances in which a plaintiff's ability to engage in certain personal activities

"does not constitute substantial evidence that he or she has the functional capacity to engage in

substantial gainful activity."  Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000) (finding that

"staying around the house" and "watching T.V." do not constitute substantial evidence that the

claimant could work); see also Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (a claimant's

ability to engage in "personal activities such as cooking, cleaning, and hobbies" does not per se

constitute substantial evidence that the claimant could work).  But that is not the case here, given

both the extent of Plaintiff's activities and the ample independent evidence that she was not totally

disabled.

Moreover, the medical record shows Plaintiff received essentially no treatment after

August 24, 2010, except for the disability examination and evaluation completed by Dr. Tang.

The ALJ properly weighed Plaintiff's lack of treatment against her in assessing her credibility.

See Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011) (recognizing that failure to seek medical

treatment for mental illness is a permissible factor in determining that claimant did not suffer from

a disabling mental impairment); Moore v. Astrue, 572 F.3d 520, 524-25 (8th Cir. 2009)

(appropriate for ALJ to conisder conservative or minimal treatment in assessing credibility).

These are proper considerations. The ALJ properly considered that the objective and other medical evidence did not support Plaintiff's subjective complaints.

In reviewing the record in this case, therefore, the Court is satisfied that the ALJ complied with the standards outlined in Polaski, and gave good reasons in finding Plaintiff's subjective allegations less than credible. See Gregg, 354 F.3d at 713 (reviewing court should give deference to the ALJ's credibility determination).

### B. Weight Given to Dr. Tang's Opinions in the FCS

Plaintiff contends that Dr. Tang was a treating source. Under the Social Security regulations, treating sources are generally considered higher up in the hierarchy of medical sources. See 20 C.F.R. § 404.1502. As noted above, Dr. Tang included limitations that the ALJ did not incorporate into her RFC. The ALJ discounted Dr. Tang's opinions, giving them only "little weight." Plaintiff contends that the ALJ should have given greater weight to Dr. Tang's opinions, and that the ALJ should have adopted all of the limitations set forth in Dr. Tang's one-page Functional Capacity Statement ("FCS"). Thus, according to Plaintiff, Dr. Tang's opinions were entitled to more weight. The Commissioner, on the other hand, contends that Dr. Tang was not a treating source. Rather, according to the Commissioner, Dr. Tang merely examined Plaintiff for purposes of assisting in her effort to obtain disability benefits.

The ALJ was not required to adopt every limitation found by Dr. Tang. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.") Rather, the ALJ need only include those limitations she finds to be established by the record. "[The court] review[s] the record to ensure that an ALJ does not disregard evidence or ignore

potential limitations, but [the court] do[es] not require an ALJ to mechanically list and reject every possible limitation." McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011).

An ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source; the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; whether the physician provides support for his findings; whether other evidence in the record is consistent with the physician's findings; and the physician's area of specialty. 20 C.F.R. §§ 404.1527(c)(1)-(5); 416.927(c)(1)-(5). The Regulations define a "treating source" as a claimant's "own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had an ongoing treatment relationship with you." 20 C.F.R. §§ 404.1502, 416.902.

Furthermore, the record before the ALJ included competing opinions from several sources in addition to Dr. Tang. "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005) (internal quotation marks omitted). The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." Id. at 1013. Regardless of the decision, the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2).

Plaintiff contends that Dr. Tang is a treating expert and therefore his opinions should be accorded significant weight. The undersigned finds that the ALJ adequately considered Dr.

Tang's limitations set forth in the November 11, 2013, FCS, and substantial evidence supports the ALJ's decision to give little weight to his opinions because Dr. Tang's findings were not consistent with the medical record as a whole, and Dr. Tang was not a treating expert.

The record shows that Dr. Tang did not treat Plaintiff. Rather, on March 28, 2013, Dr. Tang evaluated Plaintiff for disability[5] and made a referral for a functional capacity evaluation and then completed disability paperwork on November 11, 2013. The limited nature of these two visits do not establish an ongoing treating relationship as required by the Regulations. Randolph v. Barnhart, 366 F.3d 835, 840 (8th Cir. 2004) (finding that a physician who saw a claimant only three times need not be afforded treating physician status). Because the record does not support Plaintiff's contention that Dr. Tang was a treating source as defined by the Regulations, the ALJ did not err in failing to accord controlling weight to his FCS.

When formulating the FCS, Dr. Tang reviewed a functional capacity evaluation completed at his request and cited this as support for his FCS. To be entitled to controlling weight, Dr. Tang's opinions in the FCS must be well supported by, and not inconsistent with, other substantial evidence in the record. Myers v. Colvin, 721 F.3d 521, 524 (8th Cir. 2013).

One of the critical issues in this case relates to the ALJ's decision not to include a limitation in the RFC that would require Plaintiff to elevate her legs while sitting. The omitted limitation depends on Plaintiff being found credible, which as discussed above, the ALJ did not find. Dr. Tang included this limitation in his FCS. But, as explained above, Dr. Tang based his FCS on the evaluation of Occupational Therapist Schlmanski. Mr. Schlmanski did not include any elevation limitation and even found Plaintiff could perform light work. Thus, the record

---

[5]Plaintiff presented "inquiring about applying for disability" and indicated that she needed to see a doctor "to evaluate me for disability." (Tr. 638, 652)

reflects that Dr. Tang's leg elevation requirement is based on Plaintiff's own subjective complaints and self-reporting, which the ALJ properly did not credit. The ALJ, therefore, was justified in discounting Dr. Tang's opinion in this regard. See Renstrom v. Astrue, 680 F.3d 1057, 1064-65 (8th Cir. 2012) (affirming where ALJ did not give controlling weight to opinion of treating doctor, where doctor's opinion was "largely based on claimant's subjective complaints."); McCoy, 648 F.3d at 617 (ALJ properly discounted doctor's opinion where evaluation was based, at least in part, on claimant's self-reported symptoms; insofar as claimant's self-reported symptoms were found to be less than credible, doctor's report was rendered less credible); Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation). Accordingly, the undersigned finds that the need for Plaintiff to elevate her legs while sitting is not based on substantial evidence or the evidence of record.

Having considered perhaps the most critical difference between the ALJ's RFC and Dr. Tang's opinion – the need, or lack thereof, to elevate Plaintiff's feet while sitting – the undersigned will also consider the remainder of Dr. Tang's opinion. The ALJ's RFC included some, but not all, of the additional limitations proffered by Dr. Tang. Dr. Tang completed the one-page FCS and found Plaintiff to be: (1) able to stand 2.5 hours, 20 minutes at a time in an 8-hour workday; (2) walk 1.5 hours, 5 minutes at a time in an 8-hour workday; (3) sit 4 hours with her legs elevated most of the time; and (4) never bend or stoop. With respect to Plaintiff's ability to lift/carry and push/pull, Dr. Tang found Plaintiff to be able to lift 20 pounds and carry 30 pounds and push 39 pounds and pull 32 pounds. Dr. Tang noted that Plaintiff is unable to operate

foot controls due to foot/ankle numbness. Dr. Tang opined that prolonged standing, walking, or sitting causes Plaintiff to experience pain and increases spasms in her right foot.

First, to the extent Dr. Tang opined that Plaintiff is disabled and incapable of performing any competitive employment, such an opinion "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," because it invades the province of the Commissioner to make the ultimate determination of disability). The ALJ did not discuss whether Dr. Tang was a treating source, but found that his opinions in the FCS were only entitled to little weight because they were inconsistent with the objective medical evidence in the record and Plaintiff's activities of daily living. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.").

Dr. Tang's notes do not reflect the degree of limitation he included in his November 11, 2013 FCS. A review of Dr. Tang's notes also shows he never imposed any work restrictions on Plaintiff. See Fischer v. Barnhart, 56 F. App'x 746, 748 (8th Cir. 2003) ("in discounting [the treating physician's] opinion, the ALJ properly noted that ... [the treating physician] had never recommended any work restrictions for [the claimant]"). Further, no other examining physician found Plaintiff disabled or unable to work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508

(8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The medical records simply do not support the findings of Dr. Tang in the FCS. Thus, the ALJ did not err in giving little weight to Dr. Tang's opinions in the FCS. Renstrom, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-controlling weight when that opinion was largely based on claimant's subjective complaints and was inconsistent with other medical experts).

In summary, the ALJ properly accorded Dr. Tang's opinions in the FCS little weight inasmuch as his findings were inconsistent with, and unsupported by, the evidence of record. See Travis, 477 F.3d at 1041 ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ c an accord it less weight.") (citation and internal quotation omitted). The record as a whole in this case supports the ALJ's decision in this regard.

## C. Other Opinion

Plaintiff also contends that the ALJ erred in weighing the opinion of non-examining, state agency consultant Dr. Julio Pardo by giving his opinion great weight.

All evidence from nonexamining sources is considered to be opinion evidence. 20 C.F.R. § 404.1527(e). "[An] ALJ is entitled to rely on the opinions of reviewing physicians when considering whether a claimant meets thee requirements of a listed impairment." Ostronski v. Chater, 94 F.3d 413, 417 (8th Cir. 1996) (citing § 404.1527(e)).

The ALJ noted that Dr. Pardo, a state agency medical consultant, reviewed Plaintiff's record on November 4, 2011. Dr. Pardo expressed the opinion that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry ten pounds, stand or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday; and had no limitations in

pushing and pulling.  Dr. Pardo noted Plaintiff has a postural limitation precluding climbing

ladders, ropes, and scaffolds due to issues with balance and bilateral foot drop and also found an

environmental limitation necessitating Plaintiff to avoid hazardous machinery and heights due to

Plaintiff's issues with balance.  The ALJ stated that she was according great weight to Dr. Pardo's

opinion because Dr. Pardo is an expert in SSA regulations, and his opinions are consistent with

the evidence as a whole.  The ALJ properly evaluated this evidence.  See 20 C.F.R.

§ 404.1527(f)(2)(i) (State agency medical consultants are highly qualified experts in Social

Security disability evaluation; therefore, the ALJ must consider their findings as opinion

evidence).

**D.      Residual Functional Capacity**

Finally, as a result of the ALJ's alleged errors regarding Plaintiff's credibility and the

opinion evidence, Plaintiff contends that the ALJ's RFC formulation is likewise flawed.  Because

the undersigned has concluded that substantial evidence supports the ALJ's adverse credibility

finding and treatment of the opinion evidence, Plaintiff's RFC argument cannot be sustained.

Nonetheless, for completeness the undersigned will address the issue.

"The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the

record, 'including the medical records, observations of treating physicians and others, and an

individual's own description of his limitations.'"  Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir.

2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  "The ALJ bears the

primary responsibility for determining a claimant's RFC and because RFC is a medical question,

some medical evidence must support the determination of the claimant's RFC."  Martise, 641

F.3d at 923.  The ALJ, however, "is not required to rely entirely on a particular physician's

opinion or choose between the opinions of any of the claimant's physicians." Id. at 927 (citation omitted). Furthermore, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. at 923. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946).

The ALJ considered the evidence of record, including the opinions and records of treating and examining doctors and therapists as well as Plaintiff's testimony. The ALJ also considered the credibility of Plaintiff's allegations and found the severity of Plaintiff's subjective complaints were not fully credible. The undersigned has found above that the ALJ's credibility determination and the weight she gave to Dr. Tang's opinions are supported by substantial evidence.

The RFC formulated by the ALJ is supported by substantial evidence in the record as a whole. The ALJ found that Plaintiff had the severe impairments of history of spinal cord injury with residual bilateral foot drop and history of a left humerus fracture. After considering the entire record, the ALJ concluded in relevant part that Plaintiff has the RFC to perform sedentary work, except she can walk for one hour out of an eight hour workday, for five minutes at a time; stand for two and a half hours out of an eight hour workday, for twenty minutes at a time; and she would require a "sit/stand option," allowing a change in position every thirty minutes at a time while remaining at the work station. The ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. The ALJ wove her credibility analysis into the RFC determination, highlighting the inconsistencies in the record. See Smith v. Colvin, 756 F.3d 621, 625 (8th Cir. 2014) ("We defer to the ALJ's evaluation of [a claimant's] credibility, provided that such a determination is supported by good

reasons and substantial evidence even if every factor is not discussed in depth.") (internal quotations and citations omitted).

The ALJ's finding that Plaintiff could perform sedentary work was consistent with the medical record.[6]   Moreover, many of the limitations posited by Dr. Tang, and which were supported by the objective evidence, are included in the RFC, including the walking and standing limitations and the inability to operate foot controls.  Because the ALJ's RFC determination is consistent with the type and level of treatment Plaintiff sought and received, medical observations and objective medical evidence, substantial evidence in the record supports the ALJ's RFC finding.  See Travis, 477 F.3d at 1040 ("If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.")  Accordingly, the undersigned finds that the medical evidence of record does not support the presence of greater limitations than those found by the ALJ, and the ALJ properly chose not to include the foot elevation requirement.

The ALJ posed a hypothetical to a VE which included all of Plaintiff's credible limitations. See Renstrom, 680 F.3d at 1067 (ALJ need only include in hypothetical to VE limitations which he finds credible).  The ALJ properly relied on the testimony of a vocational expert to find that Plaintiff could perform work existing in significant numbers in the national economy with her RFC, including a document preparer, dowel inspector, and a patcher.  See Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a vocational expert's testimony is substantial evidence

---

[6]The undersigned notes that while the ALJ found Plaintiff was limited to sedentary work, the Occupational Therapist Schlmanski found that Plaintiff "has demonstrated some functional ability in at least the Light physical demand level."  (Tr. 643)

when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations).   Apart from the ALJ's RFC formulation, Plaintiff has not identified any error regarding the VE's testimony and opinion.  Thus, the ALJ's decision finding Plaintiff not disabled is supported by substantial evidence.

**V.**     **Conclusion**

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.  Accordingly, the undersigned recommends that the decision of the ALJ denying Plaintiff's claims for benefits be affirmed.

**IT IS HEREBY RECOMMENDED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

<u>     /s/ John M. Bodenhausen     </u><br>
UNITED STATES MAGISTRATE JUDGE

Dated this <u>27th</u> day of July, 2016.